## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CASE NO. 1:12-cv-00269-MR-DLH

| | |
|---|---|
| THE ESTATE OF MICHAEL BLAKE SIPES, by Administrator Kimberly Sipes, ) ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) ) | **MEMORANDUM ORDER AND OPINION** |
| JOHNNY D. COOPER, individually and officially; MICHAEL FERRARO, individually and officially; and THE CITY OF MORGANTON, ) ) ) ) ) | |
| Defendants. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment. [Doc. 13.].

Plaintiff Kimberly Sipes ("Kimberly"), as the Administrator of the Estate of Michael Blake Sipes, brings this action, asserting four claims for relief in her Amended Complaint. [Doc. 2]. Counts One, Two, and Four allege North Carolina law claims against the Defendants. [Doc. 2 at 11-14; 16-17]. Count Three alleges a federal law claim against the Defendants pursuant to 42 U.S.C. § 1983. All of these claims assert a single wrong:

that the Defendants violated the civil and constitutional rights of Kimberly's son, the decedent herein, Michael Sipes ("Michael"), by unlawfully shooting and killing him on August 29, 2010.  [Doc. 2 at 15-16].

The Defendants have moved the Court for summary judgment on all claims, asserting qualified immunity and public official immunity. [Doc. 14 at 2-3].  For the reasons that follow, the Court will deny summary judgment as to Defendant Johnny Cooper ("Cooper") and Defendant the City of Morganton ("City"), and grant summary judgment as to Defendant Michael Ferraro ("Ferraro").

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A fact is "material" if it "might affect the outcome of the case."  N&O Pub. Co. v. RDU Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record.  Fed. R. Civ. P. 56(c)(1).

"Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. Adams. v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

The forecasts of evidence presented by Kimberly and by the Defendants are remarkably in conflict with one another regarding the facts surrounding the critical issue of qualified immunity. While the Court ultimately concludes that a genuine dispute exists as to several material facts, the background forecast of evidence giving rise to this litigation is clear. The Court will summarize these uncontested facts before addressing those facts subject to contention.

## UNCONTROVERTED FACTUAL BACKGROUND

While many of the facts that are central to this dispute are sharply contested, and the parties' forecasts of evidence are in stark contradiction in many respects, there are substantial points on which the parties' forecasts of evidence are in agreement.

On August 20, 2010, nine days before seventeen year old Michael was shot and killed on the front porch of his trailer by Cooper, Michael and his mother Kimberly were at home in their trailer located in Morganton, North Carolina. [Doc. 18-7 at 1].   Staying with Kimberly and Michael in the trailer at that time were two adult friends and the three children of these friends. [Doc. 18-2 at 37-8].   Between 10:00 and 11:00 p.m. August 20, 2010, Kimberly's friends were putting their children to bed, two of whom were crying. [Doc. 18-7 at 1].   The television set was on in the living room as were a box fan and a window air conditioner.  [Id.].

Shortly after 10:30 p.m., someone knocked on the front door of the Sipes' trailer.  Kimberly asked, "who is it?" [Id. at 2].  The person on the other side of the door said, "Morganton Public Safety Department."  [Id.]. Kimberly and Michael went to the door.  Michael, who owned a .22 caliber rifle at the time, did not retrieve it from its position in the corner of the living room before going to the door with his mother. [Id. at 3].   Kimberly, with

Michael next to her, opened the door and saw two uniformed police officers. Neither officer was concealed nor was attempting to avoid being seen. [Id. at 2]. One officer was standing on the porch at the door and the other officer was to Kimberly's left standing at the bottom of the porch steps. [Id.]. In the driveway was a marked police cruiser. [Id.]. Kimberly and Michael came out onto the porch to speak with the officers. [Id.].

The officers advised Kimberly that they had received a complaint about noise coming from her home. [Id.]. Kimberly's next-door neighbor, Betty Stewart ("Stewart"), had called the police that night. [Doc. 18-2 at 51-2]. Kimberly apologized to the officers and said that the children who were staying with her were restless and noisy and that she would see to it that they quieted down. [Doc. 18-7 at 2]. Kimberly invited the officers into her trailer but they politely declined and their conversation ended after only a few minutes. [Id.]. Kimberly said she thanked the officers and they thanked her and left. [Id.]. Kimberly also said that Michael was polite and respectful during their interactions with the officers and that she did not remember him even speaking to them. [Id.].

Nine days later, on the night of August 29, 2010, Stewart again heard "a racket" coming from the Sipes trailer. [Doc. 14-9 at 2]. To her, it sounded like kids were bouncing a ball against the hallway walls. [Doc. 18-

4 at 2].  Stewart's trailer was about 25-30 feet away from the Sipes' trailer. [Id. at 21].  Stewart's bedroom window, that faced the Sipes' trailer, was "wide open[,]" and even though it was hot that August, she never used her air conditioner, preferring instead to keep her window open.  [Id. at 5].  After a while, she heard a female voice "cussing" at the kids who were playing inside the Sipes' trailer. [Doc. 14-9 at 2].  When Stewart heard the woman cursing at the children, she decided to call the police again and lodge another noise complaint.  [Doc. 18-4 at 2].  Stewart called the general telephone number for the police department, not the "911" emergency number. [Id.].  When she told the dispatcher she wanted to report a noise complaint, the dispatcher specifically asked her if the disturbance was "violent or non-violent."  Stewart told the dispatcher that the complaint was a non-violent disturbance. [Id. 18-4 at 2-3; 7; 16-18]. "I made it very clear, I said it was a non-violent situation." [Id. at 18].  She told the dispatcher she heard "a child running up and down the trailer, hitting the walls, bouncing a ball off the walls, something like that."  [Id. at 2-3].  The police dispatcher said she would send an officer over. [Id. at 3].

A short time later, Stewart remembered hearing one or two cars being driven into the trailer park but she never actually saw the cars — they were parked out of view from both her trailer and the Sipes' trailer.  [Id. at 3;

18-19]. When she heard the car or cars, she got up from her bed and looked out her bedroom window to see one police officer standing under a street light not far away. [Id. at 20]. She did not see a second officer or know a second officer was present until later. [Id. at 4]. Stewart said by the time the police arrived at the trailer park, the Sipes' trailer was silent: "When the police got there everything was perfectly quiet. There wasn't a sound nowhere." [Id. at 22].

Cooper and Ferraro each drove their own police cars to the trailer park arriving at the same time. [Doc. 18-6 at 7]. Cooper testified he followed Ferraro's lead in turning off his car's headlights as both officers drove into the trailer park's entrance. "And the reason for this is because we didn't want anyone entering a call or answering a call to know where we're at or how we're coming in." [Id.]. Cooper testified that when he exited his car near the entrance to the trailer park, "it was very quiet, very still." [Id.]. Further, as Cooper walked to the Sipes' trailer, he did not hear any unusual sounds nor did he see any unusual activity. [Id. at 80]. Cooper stated there was sufficient ambient light from the moon and a street light for him to walk around the trailer park without the use of his flashlight. [Doc. 14-1 at 1]. Likewise, Ferraro, "the shift supervisor and senior officer on the scene[,]" [Doc. 4 at 3, ¶13], recalled that there was plenty of light at the

Sipes' trailer. [Doc. 18-5 at 59]. "It was light enough that we didn't have to use flashlights to move around, and I could actually see Officer Cooper step up onto the porch." [Id.]. After seeing Cooper walk up onto the porch, Ferraro walked around to the rear of the trailer. [Id.]. Stewart, from her bedroom next door, then heard Cooper knock on the front door of the Sipes' trailer. [Doc.18-4 at 20]. He knocked "about six times in all. Hard." [Id.].

At this point, the parties' forecasts of evidence diverge markedly. Therefore, this Court must distill the facts from the parties' evidentiary forecasts in the light most favorable to the Plaintiff as the non-moving party. Applying this standard, a jury could reasonably find the following to be true.

**THE FACTS IN THE LIGHT MOST FAVORABLE TO THE NON-MOVANT**

At the time Cooper approached the Sipes' front door, Kimberly and Michael were sitting in the living room of their trailer. Her two friends and two of their three children were in the trailer's back bedroom. [Doc. 18-2 at 54]. Kimberly had her friends' four month old baby with her on the couch. At that location, Kimberly was facing the front door of her trailer and facing Michael who was sitting in the love seat located to the side of the front door across from her. [Id.]. A window air conditioning unit was operating in the living room as was a box fan. [Doc. 18-2 at 58-9]. Kimberly said that the

8

lights in the trailer were all on but that she had blankets over all the windows to keep the sun and heat out during the day. [Doc. 18-2 at 55]. Kimberly explained that a person looking at the outside of the trailer at night might think the lights were off because the windows were covered up. [Id.].

Around 11:00 pm, Kimberly and Michael heard "loud sudden pounding knocks" on their front door. [Doc. 18-2 at 55]. Unbeknownst to them, it was Cooper who knocked on their front door. Cooper testified that he had knocked on the door using his metal Maglite flashlight. [Doc. 18-6 at 81]. The trailer's front door was made of thin sheet metal. [Doc. 18-2 at 55]. Kimberly said she heard "at least four to six" knocks. [Doc. 18-7 at 3]. She put her hand over the baby's ears [Doc. 18-2 at 78] and called out asking who was at the door, but she and Michael heard no response. [Doc. 18-2 at 57]. Kimberly said she used "a pretty loud voice" and there was no question in her mind – even with the air conditioner running – that she could have been heard through the front door. [Doc. 18-2 at 78]. Then Michael, in a very loud voice, asked a second time who was at the door. Again, they received no response. [Id. at 59; 81-2]. Stewart, in her trailer next door, could hear a person knocking loudly on the Sipes' front door. [Doc. 18-4 at 20]. After the knocking, Stewart heard someone talking

inside the trailer.  "I don't know what they said, I heard someone speak."

[Id.].  Stewart never heard Cooper respond to Kimberly or Michael speaking

from inside the trailer.  [Id. at 21].

Michael went to the corner of the trailer's living room and picked up

his .22 rifle.  [Id. at 59; 82].   He removed the trigger lock from his rifle and

then walked toward the front door and propped the rifle up against the love

seat where he had just been sitting next to the front door. [Id. at 59; 82].

Michael then unchained the secondary door lock of the front door and then

unlocked the knob lock.  [Id. 59; 83]. There was no window in the trailer's

front door so the door needed to be opened to see who was there.  [Doc.

18-7 at 3].

After unlocking the door, Michael pushed the door open with his right

foot. [Doc. 18-4 at 60]. The trailer door, hinged on the right from Michael's

perspective, opened outward. [Doc. 18-6 at 9]. Cooper, who had been

standing on the porch, moved with the door and hid himself behind the

door as it was opening. [Doc. 18-4 at 60].  At this point, Michael was about

"five to six" feet away from Kimberly and was standing in the doorway with

his back to his mother, facing the outside. [Id.].   According to Kimberly,

before Michael stepped out on to the porch, he said, "now, who the hell is

it?" [Id. at 60; 83].  Kimberly testified there was no response.  [Id. at 61; 83].

Not having heard anything, Michael picked up his rifle in his right hand from its position of leaning on the love seat next to him. Holding the gun single-handedly at the mid-section above the trigger guard with the barrel pointed upward, Michael took one step out on to the front porch. [Id. at 83]. Still holding the gun in his right hand, Michael then looked to his left. Kimberly said she could see the left profile of his face and his demeanor indicated to her that he did not see anything alarming. [Id. at 83]. Michael then turned his head to a forward facing position. Kimberly said Michael did not react as though he had seen anything looking forward. [Id.]. Michael then switched the gun from his right hand to his left side and tucked the butt end of the gun under his left armpit lowering the rifle to a "hunter's rest" with the front portion of the stock of the gun resting on the top of his left wrist. [Id. at 62; 85-6]. The barrel was pointing straight out from the front porch and downward. [Id.]. In a "hunter's rest" position, one's hands and fingers are not in the vicinity of the trigger or trigger guard area. [Doc. 22-1 at 5]. Both Cooper and Ferraro testified that there was sufficient light to see clearly in the area of the porch. [Doc. 14-1 at 1; Doc. 18-5 at 59]. Hence, a jury could reasonably infer that Cooper could see that Michael's hand was not situated so as to cause him to be a threat to shoot. Kimberly said she saw Michael "lean forward to look behind the door" and

that is when she heard the gun fire erupt from behind her front door. [Doc. 18-4 at 62; 85-6]. Kimberly also saw gold muzzle flashes from the gun that was being fired at Michael. [Id. at 91]. When Michael was on the porch and started peering around the door to his right, Kimberly said Michael did not appear to see anyone or anything before she saw the gold colored flashes begin. [Doc. 18-7 at 4].

About two minutes or less after Stewart heard the knocks on Sipes' door, after she heard people inside the trailer talking, and after she heard no response from the person knocking on the front door, she then heard gunshots. [Doc. 18-4 at 5-6]. It "was, pow, pow, pow, pow, pow, or something like that[.]" [Id. at 6]. Cooper had opened fire on Michael with a flurry of eight rounds from his Glock .40 caliber semi-automatic service pistol. [Doc. 18-6 at 73; 109]. Cooper testified he was two to three feet away from Michael when he began shooting Michael. [Id. at 111]. Cooper admitted that Michael's rifle was not pointed at him when he opened fire, and had not been at any time that Cooper perceived. [Id. at 110]. Further, Michael's hand was not on the trigger guard. [Doc. 18-4 at 62; 85-6]. At no time before shooting Michael did Cooper announce, "police," or "police department," or say "freeze," or "drop your weapon," nor did he give

Michael any other warning or command in any fashion. [Doc. 4 at 3, ¶ 10; Doc.18-2 at 93-4; Doc. 18-7 at 4].

After seeing Michael shot, Kimberly picked up her friends' four month old baby and ran outside to be with Michael. [Doc. 18-2 at 65; 92]. The officers would not allow her to get close to Michael so she ran back inside, gave the baby back to her friends, and returned to Michael "and started praying with him." [Id.]. Kimberly heard Michael "trying to gurgle something" but she could not understand him. [Id. at 67]. She told him "not to try to speak, just to talk to God in his mind." [Id. at 93]. A short time later, she "felt him take his last breath." [Id. at 67].

## DISCUSSION

A.    The § 1983 Claim and Qualified Immunity.

Kimberly's Third Claim for Relief, brought under 42 U.S.C. § 1983, alleges that the Defendants violated Michael's Fourth Amendment rights by unjustifiably employing deadly force. In response, the Defendants' claim they are not liable by virtue of qualified immunity.

> Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.

Pearson v. Callahan, 555 U.S. 223, 231 (2009). Accordingly, qualified immunity protects police officers from liability for "bad guesses in gray areas" but permits aggrieved parties to seek damages from them when they "transgress[ ] bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). Therefore, taking the evidence in the light most favorable to the Plaintiff, the Court must determine two issues: (1) did the Defendants violate Michael's constitutional rights, and (2) was the Defendants' alleged harmful conduct clearly established to be unconstitutional at the time. Pearson, 555 U.S. at 227. If either one of these issues is answered in the negative, Defendants enjoy qualified immunity and Plaintiff's § 1983 action must be dismissed.

The Plaintiff asserts that the Defendants' alleged harmful conduct – Cooper's unreasonable use of deadly force to seize Michael – was conduct clearly proscribed by the constitution. While a police officer's interaction with a person may or may not ultimately lead to the person's seizure in a constitutional sense, "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985). Therefore, if the forecast of evidence would support a jury finding that Cooper's use of deadly force was unreasonable, then Michael's

14

constitutional rights were violated and Cooper's actions were clearly established to have been unconstitutional by Supreme Court precedent predating the shooting by more than two decades. In that instance, both prongs of the qualified immunity analysis are satisfied and summary judgment cannot be granted in favor of the Defendants on that basis.

A free citizen's claim that law enforcement officials used excessive force in the course of making a "seizure" of his person are properly analyzed under the Fourth Amendment's "objective reasonableness" standard. <u>Graham v. Conner</u>, 490 U.S. 386, 388 (1989). Because Kimberly has invoked the Fourth Amendment, and that Amendment provides an explicit textual source of constitutional protection against physically intrusive governmental conduct,

> we make explicit what was implicit in <u>Garner</u>'s analysis, and hold that *all* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reason-ableness" standard, rather than under a "substantive due process" approach.

<u>Graham</u>, 490 U.S. at 395. Where the person poses no immediate threat, the use of deadly force is not justified. The use of deadly force by a police officer is reasonable when the officer has "probable cause" to believe that a person poses a threat of serious physical harm to the officer or to others.

Garner, 471 U.S. at 11. In the end, objective reasonableness of the officer's probable cause determination is the touchstone. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Graham, 490 U.S. at 397.

With these principles in mind, the legal question is whether Plaintiff's forecast of evidence can give rise to a reasonable inference that Cooper objectively lacked probable cause to believe that Michael posed a threat of serious physical harm to him. To begin, the forecast of evidence in the light most favorable to the Plaintiff shows that Cooper was dispatched to investigate a non-violent noise complaint. Upon arrival at the trailer park, Cooper conceded that he neither saw nor heard anything out of the ordinary. With sufficient ambient lighting in the trailer park, Cooper walked through the park that night to the Sipes' trailer without the aid of his flashlight to illuminate his path. He and Ferraro both approached the Sipes' trailer. Cooper walked up the steps to the front door and Ferraro left Cooper on the porch and walked around to the back side of the trailer. Cooper knocked loudly on the front door using his flashlight but did not announce his presence, either initially or in response to three queries by

Kimberly and Michael as to who was at their door. Then, when Michael pushed open the front door, Cooper moved behind the door as it was opening. Instead of side-stepping the door to permit it to open, Cooper hid behind the door and avoided addressing, face-to-face, the trailer's occupants about the noise complaint.

Given Plaintiff's forecast of evidence describing a calm, suspicionless setting, Cooper's conduct in knocking on the trailer's door in an effort to speak with the occupants but then eluding those occupants when the door opened – circumventing the very purpose for which he was dispatched to the trailer – could be viewed by a jury as objectively unreasonable.[1]

When Michael walked onto the porch, after receiving no response to his inquiry of, "now, who the hell is it[,]" Plaintiff's forecast indicates that Michael did not know who was at his front door, and that he certainly did not know that Cooper was crouching two to three feet away purposely seeking to escape detection. On several occasions, Cooper had the opportunity to announce his presence before firing upon Michael. Indeed, Supreme Court precedent imposes a duty on an officer to announce his

---

[1] While the Court is cognizant of the requirement that it must consider, for purposes of objective reasonableness, the circumstances as they unfolded *at the time*, the Court pauses to note the vastly different approach taken, and the vastly different result obtained, by the same police department, fielding the same call, to the same trailer, at the same time of night, only nine days earlier. See supra at 4-5.

presence where possible before shooting. "[I]f the suspect threatens the officer with a weapon … deadly force may be used if necessary … and if, where feasible, some warning has been given." <u>Garner</u>, 471 U.S. at 11-12.

At the moment Michael came onto the porch and first turned in the direction opposite from Cooper (again indicating that Michael did not know of Cooper's presence), Cooper could then have said, "freeze, police" or some similar command. Likewise, he could have said something when Michael turned to face forward on the porch. Cooper, however, remained silent and hidden from view. When Michael, his rifle in a "hunter's rest" fashion, began to look around the door, he did not pose an immediate threat to Cooper. Holding his rifle as he did with his hand away from the trigger, Michael was not prepared to fire his gun at that moment. Even by Cooper's own admission, there was plenty of light for Cooper to see Michael as well as to see that Michael was holding his rifle in a non-threatening manner. Based on this evidence, a rational jury could conclude that Michael posed no immediate threat to Cooper and that Cooper had ample opportunity to warn Michael on numerous occasions so as to avoid any possible threat by Michael to Cooper's safety. In other words, a rational jury could draw a reasonable inference that Cooper objectively

lacked probable cause to believe Michael posed a threat of death or serious bodily harm to him.

Cooper nevertheless argues that his actions were consistent with the standard of the objective "reasonable officer on the scene" citing <u>Sigman v. Town of Chapel Hill</u>, 161 F.3d 782, 784 (4th Cir. 1998). [Doc. 14 at 9]. He contends his split-second decision to fire on Michael was sound based on his testimony that he heard Michael fire his rifle and then saw Michael swing the gun towards him. [<u>Id.</u>]. This evidence, however, is contravened by Plaintiff's forecast of facts. While Cooper recites the correct legal standard, he errs by applying that standard to the wrong forecast of evidence. Cooper applies the facts taken in the light most favorable to him as the *moving party*. This is contrary to the dictates of Fed.R.Civ.P. 56.

The question of whether Michael fired his rifle is further muddied by the Defendants' argument concerning the application of the "sham affidavit rule." Stewart and her grandson both gave statements that they heard a shot from a .22 caliber weapon before the hail of gunfire. They later recanted. Defendants argue that these recantations should be disregarded because they are contained in "sham affidavits." [2] The affidavits of Stewart

---

[2] According to the "sham affidavit" principle, a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own

and her grandson, of course, are not affidavits of any party or the expert retained by any party. Hence, Defendants' application of the "sham affidavit rule" is dubious at best. <u>Cleveland</u>, 526 U.S. at 806 (a *party* cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting her own previous sworn statement); <u>Rohrbough v. Wyeth Labs, Inc.</u>, 916 F.2d 970, 976 (4th Cir. 1990) (a *party's expert* cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his own previous sworn statement). More importantly, however, this argument is a red herring. The forecast of evidence in the light most favorable to Plaintiff comes from Kimberly who states there was no shot fired by Michael. For the purposes of summary judgment, this is conclusive.

The Court is aware that the Defendants vigorously dispute the Plaintiff's forecast of evidence as discussed throughout this opinion. That, however, is beside the point. It is the duty of this Court to discern from the competing forecasts of evidence the factual scenario that takes the evidence in the light most favorable to the *non-moving party*, here the Plaintiff, even if contrary evidence is present. If the jury believes Kimberly's

---

previous sworn statement with a later affidavit (or other sworn testimony) without explaining the contradiction or attempting to resolve the disparity between the conflicting statements. <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 806 (1999).

forecast of evidence – looking at that evidence from the perspective of the "reasonable officer on the scene" – it was objectively unreasonable for Cooper to use deadly force against a person who was holding his rifle at a "hunter's rest" and was visibly not presenting himself as a threat of immediate harm to the officer or to anyone else.

Even if the Court were to accept Stewart's original statement that an earlier .22 shot was fired, this could still be accepted by the jury as Michael firing a warning shot[3] before placing the rifle at a "hunter's rest."  Therefore, in the light most favorable to the Plaintiff, Cooper's use of deadly force was still objectively unreasonable because he would have seen that Michael posed no immediate threat, as by then his hand was well away from the trigger.

Turning to Kimberly's forecast of evidence as it pertains to Ferraro, the facts taken in the light most favorable to her do not preclude Ferraro's defense of qualified immunity.  Ferraro admitted that he was "the shift

---

[3]Even if it were undisputed that Michael's actions amounted to the firing of a warning shot, such conduct would not give Cooper probable cause to believe his life was in danger. "[T]he inherent right of self-defense has been central to the Second Amendment right. … [That right extends] to the home, where the need for defense of self, family, and property is most acute."  Dist. of Columbia v. Heller, 554 U.S. 570, 628 (2008).  Not knowing who was knocking on his door late in the evening, and not hearing any responses to his verbal requests, Michael's firing off a warning shot for the protection of hearth and home could be viewed by a jury as reasonable under the circumstances, and based on the rationale of Heller, could even be construed as a constitutionally protected right.

supervisor and senior officer on the scene." [Doc. 4 at 3, ¶13]. Despite this admission, though, he neither directed, joined, nor observed Cooper's use of deadly force against Michael. The proffered evidence shows he was behind the trailer when Cooper shot Michael and played no role in Cooper's use of force. Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977) (supervisory liability under 42 U.S.C. § 1983 requires "personal involvement" in a constitutional deprivation). It is for this reason that the Court concludes that Kimberly has made no evidentiary showing that Ferraro's actions on the night of August 29, 2010, were objectively unreasonable in relation to Cooper's decision to use deadly force against Michael.

B.    The State Law Claims and Public Official Immunity.

Under the North Carolina doctrine of public official immunity,

The general rule is that a public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties.

Slade v. Vernon, 110 N.C. App. 422, 428, 429 S.E.2d 744, 747 (1993).

Both Cooper and Ferraro argue that they are entitled to public official immunity as to Kimberly's state law claims alleged in Counts One and Two of the Amended Complaint. Kimberly asserts that public official immunity is

unavailable to them because they acted with "malice" toward Michael. "Malice," in this context, is defined as improper conduct undertaken by an official when he "does that which a man of reasonable intelligence would know to be contrary to his duty." Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir 2003), citing Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890 (1984). A finding of malice also requires that the officer "intend [his act] to be ... injurious to another." Id., 321 S.E.2d at 890.

Accepting the forecast of evidence in the light most favorable to the Plaintiff, Cooper killed Michael using unconstitutionally excessive force. A law enforcement officer of reasonable intelligence would have known that doing so was contrary to his duty. Further, because Cooper's acts at issue violated Michael's clearly established rights, an officer of reasonable intelligence would have known that was contrary to his duty as well. Accordingly, Kimberly has forecast sufficient evidence of malice to foreclose summary judgment based on public official immunity on the Plaintiff's state law claims against Cooper.

The proffered evidence with regard to Ferraro, however, shows that he was physically apart from, and played no role in, Cooper's use of force against Michael. For the same reasons that Ferraro enjoys qualified

immunity from Kimberly's § 1983 claim, he also enjoys public official immunity from her state law claims.

Plaintiff asserted three direct claims against the City. In her First Claim for Relief, Plaintiff alleged the City was negligent and grossly negligent "in providing the hiring, training and supervision required for its officers to learn and understand proper police procedure and methods and the use of force[.]" [Doc. 2 at 11]. In her Third Claim for Relief, Plaintiff seeks damages from the City based upon her allegations of the City's "constitutionally deficient policies and practices" under federal law. [Id. at 15]. Finally, Plaintiff's Fourth Claim for Relief contains arguments advanced pursuant to the North Carolina Constitution's due process provisions, N.C. Const. art. I, §§ 1, 19, and its impermissible and improper punishment provisions, N.C. Const. art. XI, §§ 1, 2.

Plaintiff has conceded that the City is entitled to summary judgment on all of her direct claims against the City under state law. [Doc. 22-1 at 24]. Plaintiff's direct federal claim against the City is foreclosed by the Supreme Court's decision in Monell v. New York City DSS, 436 U.S. 658 (1978). A local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. It is when execution of a government's policy or custom inflicts the injury that the government as an

entity is responsible under § 1983. <u>Monell</u>, 436 U.S. at 694. Plaintiff has forecast no evidence that the execution of any City policy or custom caused Michael's death.

The City, however, has waived sovereign immunity for its employees to the extent of its liability insurance coverage. [Doc. 4 at 1-2]. Therefore, since the City admits Cooper acted within the scope of his employment at the time of this incident, the city would be vicariously liable for any wrong of Cooper the jury may find. On this basis, the City's motion for summary judgment is denied. [<u>Id.</u>].

**CONCLUSION**

Based upon the foregoing analysis, the Court concludes that Plaintiff's forecast of evidence, taken in the light most favorable to her as the non-moving party, is sufficient to preclude Cooper's assertion of qualified and public official immunity. Accordingly, this case may go forward as to Cooper and, vicariously, as to the City as well. The Court also concludes that Ferraro enjoys both qualified and public official immunity and he, therefore, should be dismissed from this action.

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 13] as to Defendant Johnny Cooper and Defendant City of Morganton is **DENIED.**

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 13] as to Defendant Michael Ferraro is **GRANTED** and he is hereby **DISMISSED** from this matter.

**IT IS SO ORDERED.**

Signed: October 28, 2013

Martin Reidinger
United States District Judge